DocuSign Envelope ID: E79492D8-3CC2-4F48-A9A2-95DA260A7C5F

| | | |
|---|---|---|
| GLENN GEORGE, | ) | IN THE |
| 3507 Sunflower Pl., | ) | |
| Bowie, MD 20721 | ) | CIRCUIT COURT |
| *Plaintiff,* | ) | |
| | ) | FOR |
| v. | ) | |
| | ) | BALTIMORE CITY |
| BALTIMORE GAS AND | ) | |
| ELECTRIC COMPANY. | ) | |
| 110 W. Fayette St. | ) | CASE NO:  C- |
| Baltimore, MD 21201 | ) | |
| *Defendant,* | ) | |
| | ) | |

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, GLENN GEORGE, by and through his counsel, hereby brings forth this action and states as follows:

### INTRODUCTION AND NATURE OF ACTION

1.      This case arises out of the unlawful  race and disability discrimination and retaliation by Baltimore Gas & Electric Company (hereinafter "BGE" or the "Company") against Glenn George (hereinafter "Mr. George") in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 2000e-2 *et seq*. and § 2000e-3 *et seq*., Title 20 of Maryland's State Government Article ("Title 20"), and the Baltimore County Human Rights Law (County Code, Article 29).

2.      BGE discriminated against Mr. George based on his race (African American) and on the basis of his disability throughout his employment with BGE, and further retaliated against him due to reporting the discrimination.

3.      Mr. George seeks compensation for economic loss, mental and emotional distress, punitive damages, and attorneys' fees and costs.

1

## PARTIES

4.      Plaintiff, GLENN GEORGE, is a resident of the State of Maryland.

5.      Defendant, BALTIMORE GAS AND ELECTRIC COMPANY., is a corporation incorporated under the laws of Maryland.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to Md. Code Ann., Cts. & Jud. Proc. § 1-501 and § 6-102 because BGE has its principal place of business in Maryland.

7.      Venue is proper in this District pursuant to § 6-201 because BGE has their principal place of business in Baltimore City.

## FACTS

8.     In or around the fall of 2017, BGE hired Mr. George as Senior Engineer for its Substation & Services Engineering Department. In this role, Mr. George was responsible for providing electrical engineering support to maintain the following substation assets: transformers, breakers, battery and battery charger systems, and battery energy storage systems.

9.     Mr. George was hired in this role because of his qualifications and experience. Mr. George has a Master's Degree in Electrical Engineering and Management and a Bachelor's Degree in Applied Sciences. Mr. George is also a licensed Professional Electrical Engineer, certified Project Management Professional, and an accredited professional in Leadership in Energy and Environment.

10.     Mr. George was part of the Substation and Services team which consisted of five employees – three technicians and two engineers.

11.     Mr. George was the only African American employee on the team during his tenure.

12.     Shortly after Mr. George was hired, BGE began discriminating against him on the basis of his race.

13.     Mr. George quickly learned that BGE has a pattern and practice of discriminating against employees on the basis of their race.

14.    In or around December 2017, Mr. George was traveling in a car with then-Manager Richard Clarke, then-Senior Manager Richard Knotts, and then Senior-Engineer Daniel Blaydon from Delta Star Transformer Factory in Lynchburg, Virginia to the BGE Electric Operations Building in Baltimore, Maryland. Notably, Mr. Clarke is white.

15.    While in the car, Mr. Clarke began discussing BGE Senior Executives – then BGE CEO Calvin Butler, then BGE VP of Operations Darryl Stokes, and then BGE VP Rodney Odey, all of whom are African American. Mr. Clarke expressed his displeasure with BGE selecting African American candidates to fill the Senior Executive positions and stated the "Black executives are prisoners running the camp," or words to that effect.

16.    Mr. Clarke went on to say that the African American Senior Executives "sent [Mr. George] to [Mr. Clarke's] department to take [Mr. Clarke's] job," or words to that effect.

17.    In an attempt to distance himself from such a racially charged conversation, Mr. George put on his headphones and turned the volume up.

18.    The next day, Mr. George spoke to Mr. Clarke about the racially-charged conversation and informed Mr. Clarke that such comments made him feel uncomfortable. Mr. Clarke responded by reiterating his position that the leadership of color at BGE were "prisoners running the camp," or words to that effect.

19.    From November 2017 until he was transferred from the Substation & Services Engineering team in July 2019, Mr. George endured harassment,

belittlement, and racially insensitive comments made about African Americans by his white team members.

20.    For example, in one incident Mr. George attended a Substation Monitoring meeting with Mr. Clarke, Ms. Archibald, Mr. Evan Siverd, and Mr. Daniel Blaydon. In the meeting, Mr. Clarke, Ms. Archibald, Mr. Siverd, and Mr. Blaydon, all of whom are white, discussed how "stupid" African American leaders and other people of color were.

21.    Mr. George later discussed the racially charged comments with Mr. Clarke, and Mr. Clarke doubled down and said the statements made in the meeting "were true."

22.    In or around March 2018, Mr. George was on a phone meeting with then-Director of Transmission & Substation Laura Wright and his then-Manager Richard Clarke discussing a Report Mr. George was working on but had not yet completed. Ms. Wright asked why the report had not yet been finished, and Mr. Clarke responded that Mr. George "is lazy," or words to that effect.

23.    Mr. George later approached Mr. Clarke to discuss his inappropriate, demeaning, and belittling comment in the March 2018 meeting with Ms. Wright. Mr. Clarke dismissed Mr. George's concerns and responded that BGE management will "just send me to sensitivity training," or words to that effect.

24.    In or around April 2018, while Mr. George was on the phone troubleshooting a problem with a vendor, then-Manager Richard Clarke interrupted Mr. George, used his elbow and shoulder to push Mr. George away, took over Mr.

George's phone line and began discussing the problem with the vendor. Mr. George approached Mr. Clarke and asked him why he (Mr. Clarke) shoved him (Mr. George) and ignored him (Mr. George). Mr. Clarke ignored Mr. George.

25.    The following day, Mr. George went to report Mr. Clarke's inappropriate behavior to Mr. Clarke's then-Manager, then-Director Stephen Goad. Mr. Goad is white.

26.    When Mr. George began reporting Mr. Clarke's behavior, Mr. Goad interrupted Mr. George and told him he ought to be "cautious about what he says about people that do a good job for the Company," or words to that effect. After that remark, Mr. George did not feel comfortable reporting Mr. Clarke's behavior to Mr. Goad, and the two discussed Mr. George's role and job duties. Mr. Goad informed Mr. George he would talk to Mr. Clarke about his managerial style, but Mr. Clarke's behavior never improved – it worsened.

27.    Although Mr. George was a Senior Engineer, in or around May 2018, Mr. Clarke assigned Mr. George the janitorial task of cleaning up the Electric Operations Building Battery room. Mr. Clarke had never assigned any of the white Senior Engineers such janitorial tasks.

28.    In or around July 2019, Mr. George informed Mr. Clarke about Ashley Archibald's, formerly Ashley Geigel, inappropriate and disrespectful behavior towards him. Ms. Archibald said Mr. George was not qualified to do his job (he was). Mr. George also overheard Ms. Archibald say to someone on the phone that Mr. George would be "evicted from the department soon," or words to that effect. Two

weeks later, Mr. George was removed from the Substation and Services team. Ms. Archibald is white.

29.    Mr. Clarke responded to Mr. George saying that Mr. George should be tolerant of the disrespectful behavior towards him since Ms. Archibald "does a good job for the company," or words to that effect.

30.    While Mr. George was removed from the Substation and Services team and assigned a new supervisor in July 2019, his desk remained where the Substation and Services team sat, and he was still assigned to a Substation Monitoring program in which Substation and Services is the main Stakeholder.

31.    In or around October 2018, Mr. George was sitting at his desk adjacent to Ms. Archibald and Mr. Evan Siverd (Electrical Engineer), when he overheard Ms. Archibald and Mr. Siverd discussing how they were going to taunt and harass Mr. George until he reacted in a manner that was "contrary to BGE's Code of Conduct in an attempt to get [Mr. George] fired," or words to that effect.

32.    In or around June 2019, Mr. George met with then-Acting Director of Substation Maintenance John Compher and Mr. Clarke to discuss Mr. Clarke's racially charged language and discriminatory actions towards Mr. George and Mr. Clarke's managerial style that supported and maintained a hostile work environment for Mr. George. Mr. Compher took notes during the meeting and assured Mr. George that he would address the issues with Mr. Clarke. Mr. Clarke's behavior did not improve.

33.    Mr. George also reported Mr. Clarke's discriminatory comments and behavior to then Senior Manager Richard Knotts.

34.    In or around November 2019, after reporting Mr. Clarke's behavior to Mr. Compher and Mr. Knotts, Mr. George lost his engineering role and was demoted to a Project Manager/Management type role in an entirely different department that required no engineering expertise.

35.    Mr. Knotts and Mr. Clarke were responsible for initiating Mr. George's transfer.

36.    Mr. Clarke hired Keith Brock as Mr. George's replacement. Mr. Brock is white.

37.    After demoting and transferring Mr. George and hiring Mr. Brock, Mr. Clarke's entire team consisted of all white employees.

38.    Mr. George was assigned to training Mr. Brock as to how to do his job.

39.    After Mr. George's demotion and transfer, Mr. George asked that the Substation Monitoring program that he was assigned to be reassigned to someone else so that he did not have to continue working with the team that was consistently harassing him and discriminating against him. Mr. George also asked that his desk location be moved so he did not have to sit near and constantly engage with the individuals that were harassing him.

40.    BGE refused to reassign the Substation Monitoring program per Mr. George's request, and Mr. George was forced to continue working with the employees that were discriminating against him and harassing him.

41.    On or about December 2019, then-Manager Joseph Meyer interrogated Mr. George about projects he was assigned to in a demeaning and harsh tone. Notably, Joseph Meyer previously interned for Richard Clarke when Mr. Meyer was a college student and as such, had a demonstrated pattern of loyalty to Mr. Clarke. Mr. Meyers is also white.

42.    In or around February 2020, in a team meeting with Mr. George, Mr. Clarke, and Ms. Archibald, then-Manager Joseph Meyer told Mr. George he had "no escalation path at BGE," or words to that effect. Mr. Meyer followed in Mr. Clarke's path by harassing and discriminating against Mr. George while he was his manager.

43.    In or around April 2020, in a meeting with Logan Hughes, Brandon Harrell, and Joseph Meyer, Mr. George presented status reports on his projects. During the presentation, Mr. Meyer was abrasive, demeaning, and belittling towards Mr. George. As Mr. Hughes was setting up to present his status report, he remarked, "that was brutal," referring to Mr. Meyer's behavior towards Mr. George.

44.    At this time, Mr. George was still assigned to the Substation Monitoring program, even though he previously asked to be re-assigned to another engineering project to escape the harassment and discrimination he endured from the team, and even though he was assigned to a different team and different supervisor.

45.    In or around July 2020, Mr. George asked then-manager Mr. Meyer to set up a meeting between the two of them and Mr. Meyer's then-Supervisor, Director Laura Wright to discuss Mr. George's role on the Substation Monitoring Program.

DocuSign Envelope ID: E79492D8-3CC2-4F48-A9A2-95DA260A7C5F

46.     Mr. Meyer informed Mr. George that Ms. Wright was reluctant to reassign the Substation Monitoring Program to someone else because it "would seem like retaliation," or words to that effect.

47.     From December 2017 to July 2021, Mr. George endured prolonged harassment and discrimination from the Substation & Services Maintenance Engineering Team and then Manager Joseph Meyer.

48.     As a result of the harassment and discrimination, Mr. George suffered severe mental distress and began seeing a Psychiatrist and Behavioral Therapist. Mr. George was diagnosed with High Anxiety and Depression.

49.     Prior to December 2017, Mr. George did not have High Anxiety nor did he have Depression. In fact, prior to December 2017, Mr. George had never sought psychiatric help.

50.     High Anxiety and Depression are disabilities within the meaning of the ADA as they substantially limit certain major life activities, as described in further detail with respect to Mr. George below. Mr. George waives his right to keep his disabilities confidential with respect to his former employer, as they are already known to the Company.

51.     During the period of prolonged harassment and discrimination to which he was unlawfully subjected, Mr. George began suffering from panic attacks and nervous breakdowns. In one incident, Mr. George was driving in a parking lot, forgot to put his car in park, and exited the car while it was still in motion. Mr. George had

to run down the road to catch up to the vehicle and hit the brakes before the moving car hit another parked vehicle.

52.    In another incident, Mr. George exited his moving vehicle without engaging the "park" gear, and the car rolled until it hit the garage door.

53.    Despite Mr. George's High Anxiety and Depression, he continued to competently perform his job duties at BGE.

54.    However, as a result of BGE's harassment and discrimination, Mr. George went on FMLA leave from May 2021 until December 2021. Mr. George attempted to return to work in August 2021, but quickly realized the harassment and discrimination was too impactful on him and, at the direction of his doctor, his medical leave was reinstated until December 2021.

55.    Around this time, Mr. George was diagnosed with Adjustment Disorder mixed with Anxiety and Depressed Mood. Mr. George's symptoms included, but were not limited to: anhedonia, depressed mood, amotivation, anxiety, stress/distress, fatigue/anergia, and concentration difficulties.

56.    Adjustment Disorder, Anxiety, and Depressed Mood are disabilities within the meaning of the ADA as they substantially limit certain major life activities, as described in further detail with respect to Mr. George above and below. Mr. George waives his right to keep his disabilities confidential with respect to his former employer, as they are already known to the Company.

57.    Despite Mr. George's Adjustment Disorder, Anxiety, and Depressed Mood, he continued to competently perform his job duties at BGE.

58.    On or about August 5, 2021, Mr. George disclosed his disabilities to BGE and submitted an ADA accommodation request due to his disabilities and emotional distress resulting from the harassment and discrimination he experienced at work.

59.    Because of his disabilities and ongoing serious health conditions, Mr. George went back on FMLA leave from August 2021 through December 2021.

60.    When he returned from leave, Mr. George was assigned a new Senior Manager – Kirk Rae. Mr. George was assigned another Project Management role for a fiber deployment program (another program that required no engineering expertise). Mr. Rae is white.

61.    Beginning in or around December 2021 and continuing through December 6, 2022, Mr. Rae belittled and harassed Mr. George, much like Mr. Clarke, Mr. Meyer, and others had prior.

62.    On or about July 5, 2022, Mr. George filed another complaint with BGE regarding the discrimination and harassment from his coworkers and supervisors. BGE failed to take action to prevent further discrimination and harassment by its employees against Mr. George.

63.    For example, on or about July 16, 2022, in a one-on-one mid-year evaluation, Mr. Rae—knowing about Mr. George's disabilities and mental health struggles and complaints about BGE employees' discriminatory and harassing treatment towards Mr. George—mocked Mr. George, his disabilities, and his mental health struggles. Mr. Rae, while smiling, told Mr. George that he should not "let those mental health issues cripple [Mr. George] from doing his job" or words to that effect.

Mr. Rae went on to sarcastically and disdainfully remark to Mr. George that maybe he (Mr. Rae) needed sensitivity training.

64.     Such comments are discriminatory, harassing, and against BGE policy.[1]

65.     After the extremely unsettling conversation with Mr. Rae on or about July 16, 2022, Mr. George reported the incident to HR employee Ivy Tompkins and Operational Health and Safety employee Charmaine Matthews.

66.     As a result of the aforementioned discrimination, harassment, retaliation, severe emotional distress, disabilities, and his ongoing serious health conditions, Mr. George, at the direction of his Psychiatrist and Therapist, went on FMLA leave again from the end of July 2022 through November 2022.

67.     Mr. George returned to work on November 30, 2022.

68.     Mr. George continued to endure harassment and discrimination by his supervisors upon his return from FMLA leave.

69.     BGE failed to address and eliminate the discrimination and harassment to which Mr. George was subjected.

70.     As a result of the intolerable work environment, Mr. George was constructively discharged from BGE on December 6, 2022.

**Harassment and Hostile Work Environment**

---

[1] (*See BGE Statement Affirming Intolerance for Expressions of Hatred, Discrimination and Violence*, Jan. 29, 2021 at https://www.bge.com/News/Pages/Press%20Releases/210109-statement-reaffirming-intolerance-for-expressions-of-hatred-discrimination-violence.aspx).

DocuSign Envelope ID: E79492D8-3CC2-4F48-A9A2-95DA260A7C5F

71.    The facts demonstrate that the environment BGE created and fostered for Mr. George was incontrovertibly hostile under the law and rife with disparate treatment on the basis of race and disability (discrimination).

72.    EEOC guidance describes harassment as unwelcome conduct that is so frequent or severe that it objectively creates a hostile or offensive work environment or results in a negative employment action. *See, e.g., EEOC Glossary for Small Businesses*. [2]

73.    Under Title VII, the ADA, and Title 20, an employer is liable for harassment if the person responsible for the harassment can make or recommend employment decisions (e.g. hiring and firing, promotion and demotion, and reassignments) or directs, supervises, or evaluates the work activities of the employee, even if that person does not have the power to make employment decisions. Additionally, an employer can be liable if its own negligence leads to harassment or enables harassment to continue.

74.    Here, supervisors Mr. Knotts, Mr. Clarke, Mr. Meyers, and Mr. Rae had hiring and firing power, demoted and reassigned Mr. George, directly supervised Mr. George, and evaluated his work activities.

75.    In addition, BGE was on notice of Mr. George's intolerable working conditions as a result of his complaints and others like them. In fact, in April 2022, seven former BGE workers, all of whom are Black, filed a lawsuit against BGE for "perpetuating a deep-seated culture of racism where African American employees

---

[2] Available at https://www.eeoc.gov/employers/small-business/eeoc-glossary-small-businesses.

DocuSign Envelope ID: E79492D8-3CC2-4F48-A9A2-95DA260A7C5F

regularly     endured     racial     slurs     [and]     discrimination." *See* https://www.baltimoresun.com/business/bs-bz-bge-exelon-racial-discrimination-lawsuit-20220413-fdaqmwsr7fb2lgsiuo7szp42ce-story.html. The lawsuit is currently pending before the Baltimore City Circuit Court (*Kevin Alston, et al. v. Baltimore Gas & Electric Co., et al*, Case No. 24C21002679).

76.    As evidenced by the facts above, throughout his tenure at BGE, Mr. George was harassed based on his race and disability and subjected to a hostile work environment on the basis of his race and disability. Derogatory remarks were made about Mr. George, his race, and his disability on numerous occasions over several years, even after repeated complaints. As a result, BGE is liable for its employees' illegal actions.

## Disparate Treatment and Constructive Discharge

77.    Mr. George can establish a prima facie case of discrimination based on disparate treatment, as he is a member of at least two protected classes on account  of his race and disability, he performed at least satisfactorily, he was removed from his position, demoted, harassed, and constructively discharged (all adverse employment actions), and the Company treated him less favorably than his similarly situated white and non-disabled peers.

78.    Throughout  his  employment  at  the  Company,  BGE  supervisors continuously and repetitively made comments about African American employees in Mr. George's  presence  and  required  him  to  perform  Project  Management  tasks outside of his job description. Such comments and requests were never made to or of

white and non-disabled employees. The Company's discriminatory animus is further evidenced by the fact that after the Company demoted and transferred Mr. George to a new role, he was replaced by a white employee.

79.    Both Maryland and federal law recognize constructive discharge as an adverse employment action, and constructive discharge exists where an "employer has deliberately caused or allowed the employee's working conditions to become so intolerable that a reasonable person in the employee's place would have felt compelled to resign." *Beye v. Bureau of Nat. Affs.*, 59 Md. App. 642, 653, 477 A.2d 1197, 1203 (1984).

80.    As described above in detail, Mr. George's working conditions at BGE were unbearable – so unbearable that he developed Adjustment Disorder mixed with Anxiety and Depressed Mood—despite no preexisting mental health history. On numerous occasions, Mr. George reported the harassing and discriminatory behavior to which he was subjected to BGE supervisors. BGE took no action to rectify the harassment and discrimination, instead allowing it to continue and intensify.

81.    In the instant case, Mr. George was forced to resign because his working conditions at BGE were so volatile and saturated with unlawful discrimination that they caused him to develop multiple mental health disorders. BGE was on notice of the harassment Mr. George was enduring, as well as the impact that harassment was having on him, and failed to address it. As a result, Mr. George was forced to resign on December 6, 2022.

**Retaliation**

82.    "To establish a *prima facie* case of discrimination based on retaliation, a plaintiff must produce evidence that []he engaged in a protected activity; h[is] employer took an adverse action against h[im]; and h[is] employer's adverse action was causally connected to h[is] protected activity." *Edgewood Management Corp. v. Jackson*, 212 Md. App. 177, 199 (2013), cert denied, 434 Md. 313 (2013). *See also EEOC Enforcement Guidance on Retaliation and Related Issues* § 1 II. (2016).[3] "An employee's complaint about an employer's allegedly discriminatory conduct, whether through formal or informal grievance procedures, constitutes protected oppositional activity." *Id.* at 201–02. *See also EEOC Enforcement Guidance* § II.A.2.

83.    Mr. George indisputably engaged in protected activity on numerous occasions cited above (e.g., repeatedly reporting discriminatory practices to HR, disclosing his disability, and requesting a reasonable accommodation on the basis of disability).

84.    BGE retaliated against Mr. George each time he engaged in a protected activity. Mr. George reported discrimination, and he was transferred out of his position and demoted. Mr. George continued to report discrimination, disclosed his disability, and requested accommodation, after which the harassment against him continued and intensified through his constructive discharge.[4] The facts establish a

---

[3] Available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues.

[4] According to EEOC guidance, retaliation includes any employer action that is "materially adverse." This means any action that might deter a reasonable person from engaging in protected activity and includes—but is not limited to—threats, warnings, reprimands, scrutiny, removing supervisory responsibilities, and engaging in abusive verbal behavior, even if it is not yet "severe or pervasive" as required for a hostile work environment. *See, id.*

causal connection between Mr. George's protected activity and the adverse actions taken against him, given their temporal proximity, at a minimum.

85.    In other words, the timing between Mr. George's protected activity, as described herein, and the Company's retaliatory conduct is *prima facie* evidence that any purported reasons the Company may assert for its illegal conduct are pretextual. *See, e.g. Waag v. Sotera Def. Solutions, Inc.*, 857 F.3d 179, 192 (4th Cir. 2017) ("[F]or purposes of establishing a *prima facie* case, close temporal proximity between activity protected by statute and an adverse employment action may suffice to demonstrate causation").

## CONCLUSION

86.    In sum, the facts demonstrate that the Company violated Title VII, the ADA, Title 20, and the Baltimore County Human Rights Law (County Code, Article 29). As a result of the Company's illegal conduct, Mr. George has experienced economic losses, suffered severe mental and emotional distress, and incurred attorneys' fees.

## CAUSES OF ACTION

### COUNT I

### Violation of Title VII of the Civil Rights Act of 1964

### 42 USC § 2000e et seq.

### Discrimination on the Basis of Race and Color

87.    Mr. George realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs of this Complaint with the same effect as through fully set forth herein.

88.    Defendant violated Title VII by subjecting Mr. George to discrimination,

harassment, and a constructive discharge based on his race and color.

89.    Mr. George is a black male, he was subjected to demotions, derogatory comments, harassment, and retaliation based solely on his skin color.

90.    No other engineer that worked with Mr. George, that was white, was ever subjected to the same treatment Mr. George was subjected to.

## COUNT II

### Americans with Disabilities Act of 1990

### 42 U.S.C. § 2000e-2 *et seq*. and § 2000e-3 *et seq.*

### Discrimination on the Basis of Disability

91.    Mr. George realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs of this Complaint with the same effect as through fully set forth herein.

92.    Defendant violated the Americans with Disabilities Act of 1990 by refusing to accommodate Mr. Georges reasonable accommodations and retaliating against Mr. George for requesting accommodations.

93.    Mr. George has the right to reasonable accommodations and the right to apply for reasonable accommodations without the threat of retaliation.

94.    Mr. George has diagnosed disabilities, to which he requested reasonable accommodations, and the Defendant responded denial of accommodations and retaliation.

## COUNT III

### Title 20 of Maryland's State Government Article

### MD. State Government Code § 20-606 (2022)

### Discrimination on the Basis of Race and Color

95.    Mr. George realleges and incorporates by reference each and every

DocuSign Envelope ID: E79492D8-3CC2-4F48-A9A2-95DA260A7C5F

allegation contained in the foregoing paragraphs of this Complaint with the same effect as through fully set forth herein.

96.    Defendant violated Title VII by subjecting Mr. George to discrimination, harassment, and a constructive discharge based on his race and color.

97.    Mr. George is a black male, he was subjected to demotions, derogatory comments, harassment, and retaliation based solely on his skin color.

98.    No other engineer that worked with Mr. George, that was white, was ever subjected to the same treatment Mr. George was subjected to.

## COUNT IV

### Baltimore County Human Rights Law

### County Code, Article 29

### Discrimination on the Basis of Race and Color

99.    Mr. George realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs of this Complaint with the same effect as through fully set forth herein.

100.    Defendant violated Title VII by subjecting Mr. George to discrimination, harassment, and a constructive discharge based on his race and color.

101.    Mr. George is a black male, he was subjected to demotions, derogatory comments, harassment, and retaliation based solely on his skin color.

102.    No other engineer that worked with Mr. George, that was white, was ever subjected to the same treatment Mr. George was subjected to.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff GLENN GEORGE prays that judgment be entered in his favor and against Defendants BALTIMORE GAS AND ELECTRIC COMPANY for compensable damages, plus interest, statutory damages, punitive damages, attorneys' fees, expert witness fees, and his costs of suit, and such other relief as this Court deems just and equitable.

WHEREFORE, Plaintiff GLENN GEORGE prays that the Court order Defendant to 1) cease using euphemisms and derogatory comments for racial and or color ; 2) implement internal policies and procedures designed to ensure that employees do not run afoul of the anti-discrimination laws of the United States and; 3) cease all activities, employment practices, and internal policies that create a hostile discriminatory environment against colored persons.

## DEAMND FOR JURY TRIAL

Plaintiff GLENN GEORGE demands a trial by jury.

## VERIFICATION

**I SOLEMNLY SWEAR AND AFFIRM** under the penalties of perjury that content of the foregoing petition are true and accurate based on my personal knowledge, information, and belief.



DocuSigned by:
79F19F66699141A...

**GLENN GEORGE**

Respectfully Submitted,

Sarah Spitalnick Esq.
23 Walker Ave., Suite 107
Pikesville, MD 21208
Phone: (484) 332-0454
MD Bar ID: 23112901
sarahspitalnickesq@gmail.com
*Counsel for Plaintiff*

## MARYLAND RULE 20-201 CERTIFICATION

**I HEREBY CERTIFY** that this submission does not contain any restricted information. Or if it does contain restricted information, a redacted submission has been filed contemporaneously pursuant to subsection (f)(2) of the above-referenced rule.

Sarah Spitalnick Esq.
*Counsel for Plaintiff*

22